IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

MANORCARE OF OKLAHOMA CITY )
(SOUTHWEST), LLC, )
 )
      Plaintiff, )
 )
vs. ) NO. CIV-13-0503-HE
 )
OKLAHOMA LUMBERMEN'S )
ASSOCIATION HEALTH PLAN PLUS, )
 )
      Defendant. )

# ORDER

Gary M. Friggeri was formerly employed by Chickasha Lumber Company Inc. During the period of his employment, he experienced medical problems resulting in his treatment by various medical providers. Among those was the plaintiff, ManorCare of Oklahoma City (Southwest), LLC ("ManorCare").

During his employment, Mr. Friggeri was covered by a health plan provided by his employer, which contracted with Oklahoma Lumbermen's Association Health Plan Plus ("the Plan") for provision of health insurance benefits. The Plan is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461. Mr. Friggeri's claims submitted to the Plan were ultimately denied by it. He eventually assigned to plaintiff ManorCare his rights under the Plan attributable to services rendered by ManorCare.

ManorCare seeks a determination that the Plan's denial of Mr. Friggeri's claim was improper and that it is entitled to payment for the services it provided to him. The central

dispute is whether the Plan was correct in denying Mr. Friggeri's claim on the basis that his injury or illness arose out of his job or occupation—hence triggering an exclusion under the Plan—or not. The case has been submitted based on the administrative record considered and compiled by the Plan.[1]

## Background

The record indicates that, on July 13, 2011, Mr. Friggeri went to his physician complaining that he had trouble concentrating, urinating, and "felt flat and preoccupied." AR 253. He stated that these issues had gone on for two months. *Id.* Mr. Friggeri returned to work the next two days, but was taken to the Grady Memorial Hospital emergency room by his roommate on July 16 because he was "not acting right" and had experienced "multiple falls." AR 65. The attending doctor's impression was hyponatremia, rhabdomyolysis, and elevated liver enzymes; a note in the medical report read "no A/C @ home, works @ lumber co, possibly overheated." AR 66, 69. Following his visit to the emergency room, Mr. Friggeri received treatment from a number of other healthcare providers, including Salman Zubair, M.D., a neurologist at St. Anthony Hospital, who determined that heat stroke was a possible cause of Mr. Friggeri's condition. AR 215.

At some point subsequent to those treatments, Mr. Friggeri filed a workers' compensation claim with the Workers' Compensation Court of the State of Oklahoma ("WCC"). His then-employer denied that his medical condition was related to his

---

[1]*References to the Administrative Record will be to "AR" followed by the page number.*

employment. In the WCC proceeding, the court considered three medical evaluations of Mr. Friggeri: 1) an evaluation by M. Stephen Wilson, M.D., concluding that the condition was work-related, AR 248-51; 2) an evaluation by Kent C. Hensley, M.D., concluding that the condition was not work-related, AR 252-59; 3) and a court-ordered evaluation by John A. Munneke, M.D., D.D.S., concluding that the condition was not work-related, AR 260-63.

Based on the three evaluations, the WCC determined that Mr. Friggeri's condition "was not a heat stroke . . . and was unrelated to alleged heatstroke. Instead, [the] problems [were] related to an underlying disease and not related to employment." AR 245. The court's order was entered on April 24, 2012. On May 4, 2012, Mr. Friggeri settled his workers' compensation claim with Chickasha Lumber Company, agreeing to release all claims and not appeal the decision in exchange for $5,000. AR 247.

On May 14, 2012, Mr. Friggeri's attorney notified the Plan of the outcome of the workers' compensation claim. AR 243. An employee of the plan administrator made a note indicating the court's decision and that the insurance claim should be paid.[2] *Id.* The claim was denied two months later, however, because the Plan determined that Mr. Friggeri's condition was related to his employment and thus not covered. AR 267. The claim was again denied at the level one and level two appeals, and after a level three independent review. AR 372, 391, 415. ManorCare then commenced this action.

---

[2]*It is unclear whether the note was intended to reflect the employee's determination that payment of the claim was appropriate or was just intended to reflect what Mr. Friggeri's counsel was requesting or suggesting.*

3

Standard of Review

Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989), sets forth the applicable standard of review in cases contesting a benefit determination under an ERISA plan. "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115. If the ERISA plan "gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan, [the court] review[s] the administrator's decision for an abuse of discretion." Murphy v. Deloitte & Touch Group Ins. Plan, 619 F.3d 1151, 1157 (10th Cir. 2010) (internal citations omitted). The court's review under the abuse of discretion, or arbitrary and capricious, standard is limited, ". . . asking only whether the interpretation of the plan 'was reasonable and made in good faith.'"[3] Weber v. GE Group Life Assur. Co., 541 F.3d 1002, 1011 (10th Cir. 2008) (quoting Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co., 491 F.3d 1180, 1189 (10th Cir.2007)). *See* Cardoza v. United of Omaha Life Ins. Co., 708 F.3d 1196, 1201-02 (10th Cir. 2013) ("Certain indicia of an arbitrary and capricious denial of benefits include lack of substantial evidence, mistake of law, bad faith, and conflict of interest by the fiduciary.") (internal quotations omitted).

---

[3]The Tenth Circuit "treat[s] the terms 'arbitrary and capricious' and 'abuse of discretion' as interchangeable in this context." *Weber v. GE Group Life Assur. Co., 541 F.3d 1002, 1010 n.10 (10th Cir. 2008) (internal quotations omitted); accord Foster v. PPG Indus., Inc., 693 F.3d 1226, 1231-32 (10th Cir. 2012).*

The parties agree that the deferential "arbitrary and capricious" standard of review applies to the court's review here. The general principles involved with such a review are clear enough. In making a determination of whether the benefit denial was arbitrary and capricious, the court necessarily considers the provisions of the plan at issue. Weber, 541 F.3d at 110. The plan documents are scrutinized as a whole and if unambiguous are construed as a matter of law. Words are given the common and ordinary meaning that "a reasonable person *in the position of the plan participant*, not the actual participant, would have understood the words to mean." *Id.* (internal quotations omitted). If the plan language is ambiguous, the court then "take[s] a hard look and determine[s] whether [the Plan's] decision was arbitrary in light of its conflict of interest." *Id.* (internal quotations omitted).

"As part of this review, [the court] 'typically consider[s] whether: (1) the decision was the result of a reasoned and principled process, (2) is consistent with any prior interpretations by the plan administrator, (3) is reasonable in light of any external standards, and (4) is consistent with the purposes of the plan.'" *Id.* (quoting Flinders, 491 F.3d at 1193). In determining whether an abuse of discretion is shown, the court "'consider[s] only the rationale asserted by the plan administrator in the administrative record and determine[s] whether the decision, based on the asserted rationale, was arbitrary and capricious.'" *Id.*

Although conceding that the arbitrary and capricious standard applies, plaintiff asserts that the Plan operates under a conflict of interest since it is both the decision-maker and the payor of benefits. It argues the conflict must be considered in determining whether the denial was arbitrary and capricious. Defendant argues that no conflict of interest exists or that, if

5

one exists, it is *de minimus.*

The Supreme Court addressed the conflict of interest issue in Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105 (2008). The Court concluded that when "the entity that administers the plan, such as an employer or an insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own pocket," a conflict of interest is created by the dual role. *Id.* at 108. While "the presence of a dual role conflict does not alter the level of deference accorded an administrator's decision," the court "must weigh the conflict 'as a factor in determining whether there is an abuse of discretion,' according it more or less weight depending on its seriousness." Murphy, 619 F.3d at 1157 n.1 (quoting Glenn, 554 U.S. at 115)). "[A] conflict of interest affects the outcome at the margin, when [the court] waver[s] between affirmance and reversal." Hancock v. Metropolitan Life Ins. Co., 590 F.3d 1141, 1155 (10th Cir. 2009). "A conflict is more important when 'circumstances suggest a higher likelihood that it affected the benefits decision,' but less so when the conflicted party 'has taken active steps to reduce potential bias and to promote accuracy.'" *Id.* (quoting Glenn, 554 U.S. at 117).

Here, the court concludes a conflict of interest exists, due to dual status of the defendant. However, though that conflict is more than a *de minimus*, it is relatively small. That conclusion flows from the fact, among others, that the Plan is funded by multiple members associated with the Oklahoma Lumberman's Association, reducing the incentive for a member of the Committee to consider the financial consequences of claim payment to his or her particular employer. Further, because of its structure, amounts not paid by the Plan

on claims do not inure directly to the benefit of the members, but must be used for Plan purposes. In any event, the court concludes a conflict is present and entitled to some consideration, but is not a major factor in the application of the applicable standard.[4]

## Discussion

The Plan is a self-funded, ERISA-regulated, employee benefit program. Its claims handling procedure involves both a "Claims Administrator" and a "Plan Administrator." The Plan establishes a three-step appeals process for denied claims. The level one appeal is a review by a qualified person who was uninvolved with the initial denial. AR 44. The level two appeal is a review by the Plan Administrator, which is the Employee Benefits Committee of the Oklahoma Lumberman's Association. *Id.* The third level is an external review. *Id.*

Under the terms of the Plan, benefits are not payable for injuries or illnesses that are "occupational," which is defined as:

> [A]n Injury or Sickness . . . that [] arises from work for wage or profit including self-employment, whether or not the injured person is required to be covered under any law for compensation for such injuries. The Plan Administrator has sole discretion to determine if an Injury or Sickness is Occupational.

ManorCare argues that the denial of Mr. Friggeri's claim was an abuse of discretion for three reasons: 1) the denial was based on a selective review of the record because it failed to consider the decision of the workers' compensation judge and medical evaluations

---

[4]*The court is unpersuaded by defendant's suggestion that the existence of fiduciary duties as to the Committee "negate[s] any alleged conflict of interest here." [Doc. #25, p. 14]. The fact that someone is duty bound to treat others fairly does not necessarily remove a conflict-based incentive to do something else.*

7

admitted in that case; 2) the denial improperly considered Mr. Friggeri's settlement of the workers' compensation claim; and 3) the external review in the level three appeal incorrectly interpreted the medical evaluation on which it based its opinion. The Plan counters that there is substantial evidence in the record to support its decision, that Mr. Friggeri's commencement and settlement of his workers' compensation claim amounts to an admission that his condition was occupational, and that he is judicially estopped from denying that his condition was occupational.

While the deferential nature of the court's review makes the question close, the court nonetheless concludes, after a thorough review of the Administrative Record, that the denial of Mr. Friggeri's claim was erroneous under the indicated standard. That conclusion flows from a number of factors.

The treatment in the appeal process of the opinion of Dr. Munneke is perhaps the most compelling evidence that the Plan's ultimate denial was improper. As noted above, Dr. Munneke's opinion was the result of an order by the WCC judge, presumably intended to get a medical opinion from an expert not associated with either of the parties, in the WCC proceeding. Dr. Munneke's opinion (i.e. his letter of November 21, 2011; AR 380) was unequivocal as to whether Mr. Friggeri's medical problems were work related or not. After describing the history and treatment of Mr. Friggeri, Dr. Munneke concluded:

> Based on my examination of the patient on the 21st of November of 2011 as well as review of medical records, it is my opinion that the patient's current condition is unrelated to any heatstroke that occurred while at work.
>
> . . .

8

> It is my opinion his current complaints and neurological symptomology appear to be related to an underlying disease process that resulted in his hyponatremia and would not have a relationship to his employment.
>
> The patient is in need of further medical care, however, the need for further medical care is unrelated to his work at Chickasha Lumber Company and, in my opinion, the patient did not sustain an injury as a result of his work at Chickasha Lumber Company.

The WCC explicitly relied on Dr. Munneke's opinion in concluding that Mr. Friggeri's condition was due to an underlying disease and not related to employment. AR 384. However, in the initial denial of the claim and the first level review of it, the Plan appears not to have considered the Munneke opinion or WCC determination at all. At least there is no explicit indication that it did. Rather, it recites its reliance only on the medical records from Grady Memorial Hospital and St. Anthony Hospital as the basis for its conclusion that Mr. Friggeri's condition was work-related.

The second level appeal indicates the Plan Administrator considered the WCC order and Dr. Munneke's opinion,[5] but there is no indication of what effect it gave Dr. Munneke's letter or how it concluded something so completely opposed to his conclusion—the denial simply lists the Munneke letter/opinion as part of what its decision was "based on." While there is no requirement in this context that every significant piece of evidence considered be discussed in an appeal denial letter, it is at least odd that the only doctor's opinion specifically referenced as having been considered—which drew a conclusion exactly

---

[5]*The denial letter, AR 392, indicates it considered "Medical records from Dr. Munneke dated November 21, 2011." This appears to mean his November 21 letter, rather than any separate set of "records" it received from him.*

9

opposite that of the reviewer—was not discussed in some fashion.[6]

By the third, independent review level, the treatment of Dr. Munneke's letter is even more inexplicable. The letter affirming the denial of benefits, AR 411-413, concluded Mr. Friggeri's injury or sickness was work related, and did so with this remarkable statement:

> The Letter from John A. Munneke, M.D. and the Medical records from St. Anthony's Hospital make clear that the treatment for which Mr. Friggeri requests payment by the Plan was a work related injury or sickness.

That conclusion was, of course, the complete opposite of what Dr. Munneke opined and, even giving maximum effect to whatever the St. Anthony records may have suggested, it was plainly inaccurate to say that the two together made the work-related nature "clear."

Defendant argues that this reference to Dr. Munneke's letter and opinion does not matter because Dr. Munneke's opinion was in error, based on his mistaken understanding of Mr. Friggeri's body temperature at the time of his arrival at Grady Memorial Hospital. Dr. Munneke may or may not have been in error based on the body temperature question, but at this point that is beside the point. Defendant did not reject Dr. Munneke's letter or opinion on the basis it was wrong or based on inaccurate data. To the contrary, it cited Dr. Munneke's opinion as part of <u>the basis</u> for defendant's conclusion. As noted above, the Plan's decision is evaluated based on "the rationale asserted by the plan administrator in the

---

[6]*The failure to mention in any fashion the decision of the WCC is also somewhat remarkable, given the fact that it was a court determination on the issue central to the appeal denial. While that court determination was not binding on the Plan, which was not a party to the WCC proceeding, and the WCC judge's determination was essentially a layman's determination of the medical issues based on expert testimony of others, it would nonetheless seem to be a feature not present in an ordinary claim situation.*

administrative record," Weber, 541 F.3d at 1011, not some better explanation that is thought of later.

By the time of the third level appeal—the independent review just mentioned—the rationale for the denial had changed somewhat. The review letter continued to rely on the view that Mr. Friggeri's problems were work related and on Dr. Munneke's letter, among other things. But it also took the position that the settlement agreement entered into in the WCC proceeding was broad enough to cover any claim he might have against the Plan. It did not claim that entry into the settlement agreement estopped Friggeri from asserting a claim with the Plan or that doing so violated some other provision of the Plan. Rather, it took the position that the breadth of the Settlement Agreement's release provisions ("The Settlement Agreement in question is very broad.") extended to releasing directly any claim against the Plan: "It is the Firm's considered opinion that the language of the Settlement Agreement bars any claim that Mr. Friggeri would have under the Health Plan." AR 411.

The release language of the Settlement Agreement is indeed broad in some respects, but it was clearly directed to potential claims against the employer, Chickasha Lumber Company, and its workers' compensation insurer. The language cannot plausibly be read to extend to the release of any claims Mr. Friggeri might have against his health insurer, which was not a party to or otherwise involved in the WCC proceeding. Here, defendant tacitly concedes this point, as it explicitly does not argue that the Settlement Agreement directly released claims against the Plan. ("The OLA did not assert that basis for upholding the denial, and does not assert it here. (Emphasis in the original.)) [Doc. #25, p. 10, para. 43].

11

It is true that the final denial letter from the administrator, AR 415, asserted a somewhat different argument (relying on the settlement agreement as a basis for estoppel rather than as effecting a direct release), but the independent review nonetheless reflected an unreasonable reading of the Settlement Agreement.

As noted, the matter of estoppel was mentioned in the final denial later. The letter stated:

> You sued your employer in the Oklahoma Worker's Compensation Court, you invoked that Court's jurisdiction, you affirmatively asserted that you were injured on the job, and you demanded occupational injury benefits for what you contended was an occupational injury. You successfully settled your lawsuit, and received and accepted proceeds for your occupational injury claim from your Worker's Compensation carrier. You are *estopped* from taking a contrary position, and from seeking non-occupational injury benefits from the Plan for the same injury for which you demanded, received and accepted compensation from your occupational injury carrier. (emphasis added).

Defendant continues to press the estoppel argument here. However, recognizing that ERISA preempts application of state law estoppel principles which might otherwise apply,[7] it is clear defendant now relies on principles of judicial estoppel, as opposed to some other type.

Judicial estoppel is a doctrine designed to "protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." Kaiser v. Bowlen, 455 F.3d 1197, 1203 (10th Cir. 2006)(quoting New Hampshire v. Maine, 532 U.S. 742, 749-50 (2001)). The doctrine is "probably not reducible to any

---

[7]*See* Kerber v. Qwest Group Life Ins. Plan, *647 F.3d 950, 962 (10th Cir. 2011), referenced in defendant's brief [Doc. #25, p. 23]. In other contexts, the $5000 settlement might well have had more significant consequences for plaintiff.*

12

general formulation of principle" but is an equitable doctrine invoked by the court in its discretion. New Hampshire v. Maine, 532 U.S. at 750. The Tenth Circuit has, however, identified the factors that will ordinarily figure into a judicial estoppel determination:

> First, a party's later position must be clearly inconsistent with its earlier position. Moreover, the position to be estopped must generally be one of fact rather than or law or legal theory. Second, whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was mislead. The requirement that a previous court has accepted the prior inconsistent factual position ensures that judicial estoppel is applied in the narrowest of circumstances. Third, whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

Kaiser v. Bowlen, 455 F.3d at 1204 (quoting Johnson v. Lindon City Corp., 405 F.3d 1065, 1069 (10th Cir. 2005)); see also New Hampshire v. Maine, 532 U.S. at 750-51.

It is less than clear to the court that the Plan was, at the claim denial stage, entitled to invoke judicial estoppel at all. The doctrine protects the integrity of the judicial process, and its not obvious that the Plan and its benefit determination procedures would be seen to be part of the judicial process.[8] However, as this case obviously involves a second court, the doctrine is, by now, potentially applicable.

The court concludes that judicial estoppel is not appropriate in these circumstances. The first factor identified in Kaiser is present here. Mr. Friggeri took a different position in

---

[8]*Of course, it is possible that the reference to estoppel in the denial letter was not necessarily intended to apply to "judicial" estoppel in particular and may have contemplated broader or different estoppel principles.*

13

the WCC proceeding, arguing that his illness was work-related, than what he and/or his assignee urge here.[9] The second factor, however, is not present. That factor requires the prior court to have <u>accepted</u> the position that was being urged there. That did not occur. The WCC rejected Mr. Friggeri's workers' compensation claim, specifically finding that his injury or illness was not work-related. A determination by this court that plaintiff should recover would in no way be inconsistent with the decision of the WCC. The subsequent settlement agreement complicates the picture somewhat, and the court can envision circumstances under which a substantial settlement might be viewed as a successful assertion of the prior position, but the settlement here falls short of showing that. The receipt of $5000 is not *de minimus* and suggests more than a nuisance value settlement, but not by much. Weighed against the total medical bills potentially affected by the determination, the settlement cannot reasonably be viewed as making Mr. Friggeri a "winner" as to his prior position or as somehow suggesting acceptance of the position he urged in the WCC.

The third factor also does not suggest that judicial estoppel is appropriate here. That factor examines whether there is either unfair benefit to the party advocating the changed position or unfair detriment to the other party. The court cannot see that Mr. Friggeri's position and conduct in these proceedings was unreasonable or that he unfairly benefits from the positions he has asserted. From his standpoint, he knew that his injury or illness would

---

[9]*It is less clear whether the position he advocated there would necessarily be viewed, or at least entirely viewed, as an assertion of fact rather than law. As discussed below, the factual question of what caused Mr. Friggeri's condition is not one that he, as a layman, would necessarily have known the answer to.*

14

be covered either by his employer's workers' compensation insurance, if it was work-related, or by his employer-provided health plan if it was not. But the particular nature of his illness was not such that he, as a layman, could have been expected to know exactly what caused his condition. Medical professionals reached different conclusions about it. Some of these differences may have been explainable by the nature or timing of their examinations (i.e. preliminary, or cursory, or more detailed after examination, etc.), but at least part of the reason was that symptoms like those displayed by Mr. Friggeri did not lend themselves to quick and easy answers about causation. Further, the structure of the Oklahoma court system did not permit Mr. Friggeri to resolve the question of what caused his condition, or of which insurance he should look to for coverage, in a single forum. In these circumstances, the court cannot say that Mr. Friggeri acted unreasonably or was unfairly benefitted by reason of his change of position.[10] Also, the Plan is not unfairly harmed. It did not change its position in any way based on the position Mr. Friggeri took in the WCC proceeding and is being held liable only for amounts it would otherwise have owed anyway if a claim against it had been pursued and established in the first instance.

In sum, defendant's reliance on the doctrine of judicial estoppel is unpersuasive.

Finally, defendant argues that Mr. Friggeri's assertion of the "work-related" position in the WCC proceeding, if not a basis for estoppel, is at least an admission and substantial

---

[10]*As noted above, the receipt of money under the settlement agreement makes the question closer than it would otherwise be, but the amount received is not sufficient to significantly shift the equities here.*

evidence of the work-related nature of the injury. That Mr. Friggeri first pursued a claim on the basis his condition was work-related is no doubt <u>some</u> evidence that it was work-related. But for the reasons referenced above—principally the inability of a layman to make the sort of determination central to the issue—it is evidence with minimal weight for present purposes and considerably less than "substantial" evidence which might otherwise justify the Plan's decision.

Taking these factors together, and giving some though limited impact to the conflict of interest which potentially impacted the Plan's decision, the court concludes defendant's denial of benefits was in error and sufficiently so as to satisfy the "arbitrary and capricious" standard referenced above. The court declares and determines that plaintiff is entitled to payment from the Plan for the services rendered by it.

**IT IS SO ORDERED**.

Dated this 24th day of January, 2014.

_____
JOE HEATON
UNITED STATES DISTRICT JUDGE